UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

ROBERT SMITH,

        Plaintiff,

   -against-

CAROLYN COLVIN, Commissioner of Social Security,

        Defendant.

-----------------------------------------------------------------x

**Memorandum of
Decision & Order
14-cv-5868(ADS)**

<u>APPEARANCES:</u>

**Law Offices of Sullivan & Kehoe, LLP**
*Attorneys for the Plaintiff*
44 Main Street
Kings Park, NY 11754
      By:     Michael Brangan, Esq., Of Counsel

**U.S. Attorney's Office, Eastern District of New York**
*Attorneys for the Defendant*
610 Federal Plaza, 5th Floor
Central Islip, NY 11722
      By:     Gail A. Matthews, Assistant U.S. Attorney

**SPATT, District Judge:**

On October 7, 2014, the Plaintiff Robert Smith (the "Plaintiff") commenced this civil appeal pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405 *et seq.*, challenging a final determination by the Defendant Acting Commissioner of Social Security Carolyn W. Colvin (the "Commissioner"), that he is ineligible to receive Social Security disability insurance benefits.

Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(c), for judgment on the pleadings. For the reasons that follow, the Commissioner's motion for judgment on the pleadings is granted; the Plaintiff's cross-motion for judgment on the pleadings is denied; and the Commissioner's denial of benefits is affirmed in its entirety.

# I.  BACKGROUND

The Plaintiff, 55, worked as bus driver and bus inspector for 33 years.  On February 1, 2013, after allegedly suffering a right shoulder injury while pulling up a wheelchair lift, he applied for Social Security disability insurance benefits.  In his application for benefits, the Plaintiff asserted that in addition to his right shoulder injury, he also suffered from hypertension and severe impairments to his left shoulder and left knee.  Although his on-the-job injury occurred on October 23, 2011, he alleged a disability onset date of September 21, 2012, when he stopped working.

On June 11, 2013, the Social Security Administration ("SSA") denied his application.

On reconsideration, including a hearing held on October 22, 2013, Administrative Law Judge Joseph Faraguna (the "ALJ") upheld the SSA's initial determination that the Plaintiff was not eligible to receive disability insurance benefits.   In particular, on December 17, 2013, the ALJ issued a written decision concluding that, during the period of time from September 21, 2012 through the date of the decision (the "Relevant Time Period"), the Plaintiff retained the functional capacity to perform light work jobs that existed in significant numbers in the national economy.

On August 15, 2014, the Commissioner's Appeals Council denied the Plaintiff's request for administrative appellate review of the ALJ's determination, making the ALJ's December 17, 2013 written decision the final decision of the Commissioner.

On October 7, 2014, the Plaintiff commenced this civil appeal.

On September 29, 2015, the parties' cross-motions for judgment on the pleadings were fully submitted to the Court.

## A.  The Non-Medical Evidence

### 1.  The October 22, 2013 Administrative Hearing

On October 22, 2013, the Plaintiff, then 52, appeared with counsel for an administrative hearing.

### a.    The Plaintiff's Testimony

The Plaintiff testified that he is married and lives with his wife and two adult children.

He testified that he drove a bus for 33 years, first for a company called Triboro Coach and later for the MTA.  However, he testified that he has undergone total replacement surgeries on both shoulders, which now render him unable to perform this work.  The first surgery was performed by Dr. Louis Bigliani in 2000.  The second was performed by Dr. Charles Jobin in December 2012.

With regard to his symptoms, the Plaintiff testified that he experiences pain and limited range of motion in his shoulders.  In this regard, he testified that when he reaches or attempts to lift his hands above his head, he experiences pain that he rates a 6/10 or 7/10.  This pain causes him difficulty performing certain activities of daily living, such as getting dressed and applying deodorant.  He also testified that he awakens during the night due to pain from sleeping on his side.

### b.    The Testimony of Vocational Expert Frank Lindner

At the hearing, the ALJ called an independent vocational expert named Frank Lindner to testify.

Mr. Lindner testified that he "totally agree[d]" that the Plaintiff could no longer drive a bus.  However, despite his physical impairments, Mr. Lindner identified one occupation, namely, "callout operator," that he believed the Plaintiff could perform.  He described the job of a callout operator as follows:

> Compiles credit information for like companies that copy – collect bills, copy information on to forms, telephone subscribers.  It's like working for like a credit company is what it would be.  The outlook for this job, locally like in New York would be 2,820 jobs, nationally would be 5,650.

R. 83.

Mr. Lindner also stated that he could identify two other occupations that he believed the Plaintiff could perform, but the ALJ did not ask him to do so.

The Plaintiff's attorney declined to ask any questions of Mr. Lindner.

2.      The October 31, 2013 Vocational Interrogatory

On October 31, 2013, at the request of the ALJ, a second independent vocational expert, namely, Dr. David Vandergoot, completed a written vocational interrogatory form regarding his impression of the Plaintiff's vocational status based on a review of the evidence in the case file.

Dr. Vandergoot noted the Plaintiff's past work as a bus driver and bus inspector, both of which are semi-skilled, medium work jobs.   He considered the following hypothetical question posed by the ALJ:

> Assume a hypothetical individual who was born on March 31, 1961, has at least a high school education and is able to communicate in English . . . , and has work experience as [a bus driver and bus inspector].   Assume further that this individual has the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that he cannot perform grabbing or pushing and cannot use his right arm for repetitive activities.
>
> . . . Could the individual described [above] perform any of the claimant's past jobs as actually performed by the claimant or as normally performed in the national economy?

R. 203.

Dr. Vandergoot answered this question in the negative, opining that the exertional demands of the Plaintiff's past work exceeded his current capabilities.   In particular, Dr. Vandergoot noted that a "light work" RFC precluded work as a bus driver and/or inspector.

However, similar to Mr. Lindner, Dr. Vandergoot concluded that a hypothetical individual operating within the Plaintiff's limitations would nevertheless be able to perform the sedentary requirements of representative occupations such as surveillance system monitor and school bus monitor, as well as the light work requirements of a host/hostess.

B.      The Medical Evidence

The administrative record contains medical reports from a number of treating and consulting physicians.   The Court will summarize this evidence to the extent necessary to resolve the present cross-motions.

The earliest available treatment records come from the Plaintiff's longtime treating cardiologist Steven M. Kobren, M.D. who is affiliated with the New York University Langone Medical Center and practices in Great Neck.

On December 29, 2008, the Plaintiff visited Dr. Kobren's office for his hypertension. A physical examination at the hands of Dr. Kobren's colleague, Dr. Jeffrey Spivak, was unremarkable and the notes from this visit do not reflect any complaints on the part of the Plaintiff. Dr. Spivak refilled the Plaintiff's prescription for Hyzaar, a blood pressure medication, and directed him to follow up with Dr. Kobren.

On January 7, 2009, the Plaintiff complained to Dr. Kobren of shortness of breath, but denied experiencing chest pain or other symptoms. An echocardiogram performed on that date revealed left ventricular hypertrophy, indicating a heart murmur. Dr. Kobren also noted that the results of an earlier electrocardiogram, performed on an unspecified date, had been abnormal, although he did not elaborate on this finding and it does not appear that he recommended any additional treatment.

On February 24, 2010, the Plaintiff followed up with Dr. Kobren with complaints of unusual chest discomfort, shortness of breath, and palpitations. However, other than some fatigue and shortness of breath on exertion, the results of an exercise stress test and myocardial perfusion imaging performed on that date were normal. An echocardiogram again showed left ventricular hypertrophy, and the Plaintiff was continued on Hyzaar.

On April 17, 2012, the Plaintiff visited David M. Dines, M.D., a sports medicine specialist affiliated with the Hospital for Special Surgery, who also practices in Great Neck. Dr. Dines noted that the Plaintiff reported pain and discomfort in his right shoulder, which displayed crepitus – a grating sound produced by the joint – and was restricted in all motion planes. Dr. Dines opined that the Plaintiff's only options for obtaining relief were intra-articular cortisone injections or a total shoulder replacement. Based on severe osteoarthritis shown on x-rays and MRI images, Dr. Dines recommended surgical repair.

During an April 25, 2011 evaluation, Dr. Kobren noted that the Plaintiff's hypertension was well-controlled by prescription medication and a physical examination was unremarkable.

As noted above, on October 23, 2011, the Plaintiff, then 50, claims to have suffered an on-the-job injury pulling up a wheelchair lift on a bus. Apparently, he applied for Workers' Compensation benefits in connection with this injury.

On May 7, 2012, Dr. Kobren noted that there had been no changes in the Plaintiff's relevant medical history since his January 2009 visit, although the Plaintiff admitted to some fatigue and tiredness. Dr. Kobren prescribed Levaquin, an antibiotic, and Allegra, an antihistamine, for a bout of bronchitis, and encouraged the Plaintiff, who stood about six feet tall and weighed 255 pounds, to lose weight. He also continued the Plaintiff on Hyzaar for his high blood pressure, which the doctor again noted was under control.

The results of an exercise stress test and myocardial perfusion imaging performed on May 11, 2012 were normal.

In mid-2012, the Plaintiff also came under the care of Dr. Stephen Huish, a doctor of osteopathic medicine affiliated with Physicians Medical Rehabilitation Associates, PLLC in Bayside.

The Court notes that a January 23, 2014 decision issued on the letterhead of the Chair of the State Workers' Compensation Board states that "Dr. Huish first examined the claimant on October 23, 2011," namely, the date of the Plaintiff's alleged injury. *Id.* However, no record of this visit was provided for the Court's review.

Dr. Huish's earliest available treatment records reflect an office visit on August 15, 2012, during which the Plaintiff complained of persistent bilateral shoulder pain. The pain had reportedly worsened, although the Plaintiff reported some benefit from physical therapy. Dr. Huish noted tenderness over the anterior and lateral aspects of the right shoulder and a limited range of motion in that joint, namely, forward flexion to 98 degrees; abduction to 93 degrees; cross-body adducton to 12

degrees, with pain; and "markedly restricted" internal and external rotations. The doctor noted "ongoing, marked weakness" in the supraspinatus, one of the muscles comprising the rotator cuff.

With respect to the Plaintiff's right shoulder, Dr. Huish's diagnosis was a rotator cuff tear; aggravation of glenohumeral osteoarthritis; and joint weakness. He opined that this condition was causally connected to the workplace incident of October 23, 2011. Nevertheless, Dr. Huish noted that the Plaintiff was making "objective, measurable progress" in physical therapy, which he recommended be continued three times per week for the next month.

Dr. Huish also noted ongoing weakness and a limited range of motion in the Plaintiff's left shoulder, namely, forward flexion to 115 degrees; abduction to 107 degrees; cross-body adduction to 15 degrees, with pain; and "moderately-to-markedly restricted" internal and external rotations. He noted a well-healed surgical site from the Plaintiff's replacement surgery in 2000.

With respect to the left shoulder, Dr. Huish opined that the Plaintiff's problems reflected a consequential aggravation of the Plaintiff's prior condition which previously required surgery.

On September 12, 2012, the Plaintiff followed up with Dr. Huish, again complaining of severe bilateral shoulder pain. However, Dr. Huish noted that the Plaintiff had continued working and reported some improvement in his range of motion due to physical therapy. Nonetheless, the Plaintiff reported transferring many of his activities at work to his left side in an effort to protect the right shoulder, which, in turn, worsened the pain in his left shoulder. He also reported some difficulty sleeping and performing the activities of daily living.

Upon physical examination, Dr. Huish noted some continued tenderness over the anterior and lateral aspects of the right shoulder and weakness in the right supraspinatus. Dr. Huish noted a slight improvement in his range of motion, namely, forward flexion to 105 degrees (previously 98 degrees) and abduction to 100 degrees (previously 93 degrees). However, the Plaintiff was still experiencing considerable pain and substitution in performing cross-body adducton to 12 degrees, and his ability to perform extension, and internal and external rotations was unchanged.

With respect to the left shoulder, the Plaintiff's range of motion was slightly diminished, namely, forward flexion to 110 degrees (previously 115 degrees); abduction to 105 degrees (previously 107 degrees); cross-body adduction to 12 degrees (previously 15 degrees); and unchanged internal and external rotations.

On this date, September 12, 2012, Dr. Huish opined that the Plaintiff's right shoulder injury had resulted in a transfer of activities to the left side, with concomitant aggravation to his surgically-repaired left shoulder. Although he remained working, Dr. Huish declared the Plaintiff moderately impaired for Workers' Compensation purposes and recommended that he continue with physical therapy three times per week.

Approximately two weeks later, on September 25, 2012, the Plaintiff reported to Dr. Huish that several days earlier, on September 21, 2012 – the alleged disability onset date – he experienced an acute onset of right shoulder pain while driving his bus. As a result, he reported difficulty lifting his right arm.

Upon physical examination, the Plaintiff's right shoulder was swollen and Dr. Huish noted increased tenderness over the anterior and lateral aspects of the joint. His range of motion was limited: forward flexion to 90 degrees (previously 105 degrees) and abduction to 80 degrees (previously 100 degrees); cross-body adducton to 7 degrees (previously 12 degrees), with increased pain and substitution; and extension to 5 degrees (previously 10 degrees). However, he was able to perform internal and external rotations to 20 degrees and 40 degrees, respectively, whereas the records from prior visits indicate no measurable ability to complete these motions.

The results of a physical examination of his left shoulder were substantially the same as in his prior office visit.

On this date, Dr. Huish opined that the work incident allegedly having occurred on September 21, 2012 had exacerbated his shoulder injury, which would require an additional 18 to 24

sessions of physical therapy to return to his baseline functional status. He declared the Plaintiff to be "temporarily totally disabled" for Workers' Compensation purposes.

Apparently, the Plaintiff did not return to work after September 21, 2012.

Physical therapy progress notes from September 26, 2012 and October 1, 2012 indicate that the Plaintiff reported intense right shoulder pain that he described as "excruciating every day."

On October 16, 2012, the Plaintiff followed up with Dr. Huish. The notes from this visit indicate that the Plaintiff reported improvement in his pain levels and range of motion, although he was still "considerably restricted." In this regard, the Plaintiff performed forward flexion to 107 degrees (previously 90 degrees, immediately after the alleged onset of disability); abduction to 103 degrees (previously 80 degrees); cross-body adducton to 20 degrees (previously 7 degrees); and internal and external rotations to 25 and 45 degrees, respectively (previously 20 and 40 degrees, respectively).

He also reported persistent left shoulder pain, and Dr. Huish noted that his range of motion in that joint was unchanged since prior visits.

Overall, Dr. Huish noted that the Plaintiff was "progressing objectively," despite remaining "totally disabled" for Workers' Compensation purposes.

On October 26, 2012, the Plaintiff visited Shariar Sotudeh, M.D. for a consultative orthopedic evaluation in connection with his claim for Workers' Compensation benefits.

Dr. Sotudeh noted that the Plaintiff drove himself to the appointment; was normal in appearance; and ambulated with a normal gait. He sat comfortably and moved his head, neck, and body freely throughout their meeting. Dr. Sotudeh noted that the Plaintiff had no difficulty getting on and off the exam table, and turned from side to side and front to back freely.

Upon physical examination of the right shoulder, Dr. Sotudeh noted no heat, swelling, effusion, erythema, or crepitus. The joint was negative for an impingement. He also measured the Plaintiff's range of motion and noted what he considered to be the normal range for each plane. The

Plaintiff performed forward flexion to 90 degrees (170-180 degrees being normal); abduction to 90 degrees (170-180 degrees being normal); adduction to 45 degrees (45 degrees being normal); extension to 40 degrees (40 degrees normal); internal rotation to 60 degrees (80-90 degrees being normal); and external rotation to 60 degrees (80-90 degrees being normal).

On the left side, which Dr. Sotudeh also noted was negative for an impingement, the Plaintiff performed forward flexion to 170 degrees (170-180 degrees being normal); abduction to 170 degrees (170-180 degrees being normal); adduction to 45 degrees (45 degrees being normal); extension to 40 degrees (40 degrees normal); internal rotation to 80 degrees (80-90 degrees being normal); and external rotation to 80 degrees (80-90 degrees being normal).

Based on these findings, Dr. Sotudeh diagnosed a right shoulder sprain/strain that was likely causally related to his on-the-job accident in October 2011. Nevertheless, he opined that the Plaintiff remained capable of performing sedentary duties, with a restriction against repetitive use of the right arm; grabbing; and lifting objects weighing more than 20 pounds.

Further, Dr. Sotudeh opined that there was no need for continued physical therapy, as it would be considered palliative and not curative.

The following month, in November 2012, on referral from Dr. Kobren, the Plaintiff came under the care of Dr. Charles Jobin, an orthopedic surgeon affiliated with New York Orthopaedic Hospital Associates, P.C.

On November 6, 2012, Dr. Jobin noted that the Plaintiff had suffered from right shoulder pain for approximately a year following his on-the-job injury, and also suffered from a subsequent exacerbation of his condition, as described by Dr. Huish above. The Plaintiff reported 10/10 pain when moving his right shoulder, but mild pain – 1/10 to 2/10 – when at rest. The pain reportedly kept the Plaintiff awake at night and prevented him from lifting his right arm over his head and performing certain activities of daily living, including practicing basic hygiene. At the time of this initial visit, the Plaintiff was taking Aleve for his pain, which only afforded him temporary relief.

Upon physical examination, Dr. Jobin noted that the Plaintiff had 120 degrees of forward elevation in his right shoulder, although with pain, and 20 degrees of external rotation. Dr. Jobin noted some crepitus in the right glenohumeral joint. On the left side, he had 140 degrees of forward elevation and 70 degrees of external rotation. He had intact external rotation strength bilaterally and "intact thumbs down in abduction strength bilaterally" with some pain noted on the right side.

X-rays of the right shoulder revealed moderate to advanced glenohumeral arthritis, loss of joint space, and what appeared to Dr. Jobin to be a B1 glenoid. Dr. Jobin also reviewed an MRI that the Plaintiff brought with him from an outside facility. He noted that, although the Plaintiff did not also produce a related radiology report, the images appeared to demonstrate a partial thickness supraspinatus tear; advanced glenohumeral arthritis; and a B1 glenoid.

On this date, the Plaintiff consented to proceed with a total right shoulder arthroplasty, which was scheduled for late-December 2012.

In the interim, the Plaintiff continued visiting Dr. Huish, who, on November 13, 2012, noted restriction in the range of motion in the Plaintiff's right shoulder, despite measurable improvement in certain planes. For example, on this date, the Plaintiff performed forward flexion to 130 degrees (previously 107 degrees) and abduction to 120 degrees (previously 103 degrees). However, he also showed deficits in certain planes, namely, a five-degree decrease in cross-body adduction. Dr. Huish stated that there were "marked deficits" in internal and external rotations, and weakness in the right supraspinatus and subscapularis.

The results of a physical examination of his left shoulder were substantially the same as in prior office visits.

Dr. Huish opined that the Plaintiff required total joint arthroplasty in his right shoulder and noted that he remained out of work and 80% disabled for Workers' Compensation purposes. However, on the recommendation of Dr. Sotudeh to the Workers' Compensation Board, Dr. Huish

temporarily discontinued physical therapy for the Plaintiff's right shoulder, a decision with which he explicitly disagreed in his report.

On December 11, 2012, the Plaintiff followed up with Dr. Huish complaining of "a marked increase" in pain in the right shoulder with diminished range of motion, strength and function. He also reported increased pain at night; persistent pain in the left shoulder; and increased weakness in the right supraspinatus and subscapularis. Dr. Huish noted a slightly restricted range of motion, namely, forward flexion to 120 degrees (previously 130 degrees); abduction to 100 degrees (previously 120 degrees); cross-body adduction to 10 degrees (previously 15 degrees); and extension to 15 degrees (previously 20 degrees). However, the Plaintiff also showed improved internal and external rotations, performing these motions to 30 and 55 degrees, respectively (previously 25 and 45 degrees, respectively).

Dr. Huish noted no change in the condition of the Plaintiff's left shoulder, and recommended that he resume physical therapy to restore him to baseline functional status.

A physical therapy progress note from December 13, 2012 indicates that the Plaintiff reported very intense right shoulder pain and discomfort.

On December 27, 2012, the Plaintiff underwent a right total shoulder arthroplasty; biceps tenodesis; and lesser tuberosity osteotomy repair at the hands of Dr. Jobin.

One week after the surgery, on January 3, 2013, Dr. Jobin noted that the Plaintiff was "doing extremely well." In particular, the Plaintiff had discontinued the use of narcotic pain relievers; experienced no fevers, chills, or drainage; showered; and performed the at-home exercises recommended by Dr. Jobin.

Further, the surgical wound was healing without any sign of infection, and the Plaintiff had active assisted forward elevation of 130 degrees, with assisted external rotation to 30 degrees. The Plaintiff had intact radial, ulnar, and median nerve distribution, as well as deltoid and axillary motor

function, and intact biceps function. He experienced some slight tingling in the median nerve distribution on the right side, but Dr. Jobin stated that this sensation was improving.

Radiographic images of the Plaintiff's right shoulder taken on January 3, 2013 indicated that the surgical hardware was intact and showed no evidence of acute fracture, malalignment, or loosening of the prosthesis.

On January 8, 2013, the Plaintiff had his first postoperative visit with Dr. Huish, who also noted that the surgical site was healed with no signs of infection. The Plaintiff was able to perform forward flexion to 85 degrees and abduction to 80 degrees, but still experienced marked deficits in the other shoulder motions. With regard to his right shoulder, Dr. Huish noted that the Plaintiff would remain out of work and was "totally disabled from any occupation" for Workers' Compensation purposes.

Further, Dr. Huish noted tenderness over the anterior aspect of the left shoulder and the acromioclavicular joint. On the left side, the Plaintiff performed forward flexion to 135 degrees (previously 110 degrees); abduction to 130 degrees (previously 105 degrees); cross-body adduction to 20 degrees (previously 12 degrees), with pain; and "moderately-to-markedly restricted" internal and external rotations.

On January 31, 2013, the Plaintiff followed up with Dr. Jobin, who noted that the Plaintiff had been attending physical therapy, where he did mostly stretching exercises. Dr. Jobin noted that the Plaintiff had "almost no pain."

Upon physical examination, Dr. Jobin noted that the surgical site was healing well with no signs of infection. The Plaintiff had intact axillary nerve strength and sensation, and was able to achieve forward elevation of 90 degrees; active assisted forward elevation to 130 degrees; external rotation to 35 degrees; and assisted external rotation to 45 degrees.

X-rays of the right shoulder was unremarkable and revealed that the Plaintiff's arthroplasty was in "good position," with the glenoid component "well seated without any radiolucent lines" and the proximal humerus component "well aligned."

Dr. Jobin advanced the Plaintiff's course of physical therapy to include some gentle strengthening exercises, in addition to stretching. He also prescribed Meloxicam, a nonsteroidal anti-inflammatory medication.

Radiographic images of the Plaintiff's right shoulder taken on January 31, 2013 again revealed normal alignment and showed no evidence of hardware-related complications.

On February 5, 2013, the Plaintiff again followed up with Dr. Huish, complaining of persistent left shoulder pain, but nevertheless reporting that he believed he was making progress in physical therapy.

Upon physical examination, Dr. Huish noted no swelling at the surgical site, which, by then, was well-healed. The Plaintiff experienced some weakness in the rotator cuff, but was able to perform forward flexion to 90 degrees (previously 85 degrees during first postoperative visit); abduction to 85 degrees (previously 80 degrees); and showed minimal improvements performing internal and external rotations.

On the left side, the Plaintiff experienced persistent weakness in the rotator cuff and a substantially unchanged range of motion.

Dr. Huish recommended a continued course of physical therapy and noted that the Plaintiff would remain out of work as he was "totally disabled" for Workers' Compensation purposes.

On February 25, 2013, the Plaintiff visited John F. Waller, M.D. for a second consultative orthopedic evaluation in connection with his claim for Workers' Compensation benefits.

Dr. Waller noted that the Plaintiff was normal in appearance; ambulated without an assistive device; and had a normal gait. He sat comfortably; moved his head, neck, and body freely

during their conversation; and required no help getting on and off the exam table. He was able to dress and undress his outerwear without assistance; and turned side to side and front to back freely.

Upon physical examination of the right shoulder, Dr. Waller noted no heat, swelling, effusion, erythema, or crepitus. The joint was negative for impingement and cuff tear. He also measured the Plaintiff's range of motion and noted what he considered to be the normal range for each plane. In this regard, the Plaintiff performed forward flexion to 80 degrees (180 degrees being normal); abduction to 80 degrees (170 degrees being normal); adduction to 40 degrees (40 degrees being normal); internal rotation to 45 degrees (80 degrees being normal); and external rotation to 45 degrees (80 degrees being normal).

On the left side, which was also negative for impingement and cuff tear, the Plaintiff performed forward flexion to 160 degrees (180 degrees being normal); abduction to 140 degrees (170 degrees being normal); adduction to 40 degrees (40 degrees being normal); internal rotation to 45 degrees (80 degrees being normal); and external rotation to 45 degrees (80 degrees being normal).

Based on these findings, Dr. Waller diagnosed a resolving status post total shoulder replacement on the right side which was causally related to the Plaintiff's workplace incident. However, Dr. Waller determined that there was no evidence of a consequential injury to the left shoulder. He recommended that the Plaintiff continue with his course of physical therapy treatment.

Similar to Dr. Sotudeh, Dr. Waller concluded that the Plaintiff retained the capacity to perform sedentary duties, with restrictions on repetitive use of the right arm, grabbing, and pushing.

One month later, on March 5, 2013, the Plaintiff followed up with Dr. Huish, who noted that the surgical site on his right shoulder was well-healed, with no signs of infection or swelling. His range of motion in that joint was mostly unchanged from the prior visit, except he displayed improved internal and external rotations, to 35 and 40 degrees, respectively. Dr. Huish noted that

the Plaintiff was making objective progress in physical therapy, which he recommended continue for an additional four weeks.

However, the Plaintiff reportedly complained of worsening pain in his left shoulder and Dr. Huish noted ongoing tenderness over the anterior aspect and weakness of the supraspinatus. His range of motion on the left side was unchanged from prior visits.

According to Dr. Huish, the Plaintiff remained out of work and "totally disabled" for Workers' Compensation purposes.

Radiographic images of the Plaintiff's right shoulder taken on March 13, 2013 again revealed that the surgical hardware was intact and properly aligned.

On March 31, 2013, Dr. Jobin noted that the Plaintiff, now 10 weeks post-operative, was doing "much better" and had "no arthritic pain" in his right shoulder. X-rays of the right shoulder showed that the joint was healing and in a "good position." However, the Plaintiff complained of some discomfort in his left shoulder, which Dr. Jobin stated would be revisited at their next visit.

On April 4, 2013, the Plaintiff underwent CT scans of both shoulders and a sonogram of the right shoulder. The sonogram revealed evidence of moderate partial thickness tears in the right subscapularis and supraspinatus tendons. The CT scan of the same joint showed detachment and mild proximal retraction of the lesser tuberosity, but no evidence of hardware loosening or polyethylene wear.

The CT scan of the left shoulder revealed evidence of glenoid prosthetic component loosening; overlying posterior polyethylene wear; and a possible rotator cuff tear.

On April 16, 2013, Dr. Huish noted that the Plaintiff's physical therapy had been discontinued pursuant to a Workers' Compensation filing. Dr. Huish noted that he disagreed with this result, stating in his report that the Plaintiff reported progressive worsening of pain in his postoperative right shoulder, with increased stiffness and difficulty performing the activities of daily living.

Upon physical examination, Dr. Huish noted increased swelling over the anterior aspect of the right shoulder and weakness in the right rotator cuff. Forward flexion was to 85 degrees (previously 90 degrees); abduction was to 80 degrees (previously 85 degrees); cross-body adduction was to 15 degrees; internal rotation was to 30 degrees (previously 35 degrees); and external rotation was to 40 degrees (unchanged).

On the left side, Dr. Huish noted persistent tenderness over the anterior aspect and weakness at the supraspinatus. Nonetheless, the Plaintiff displayed only minor deficits in his range of motion from prior visits: forward flexion to 130 degrees (previously 135 degrees); abduction to 120 degrees (previously 130 degrees); and cross-body adduction to 20 degrees (unchanged), with pain. Further, the Plaintiff was able to perform internal and external rotations to 30 and 40 degrees, respectively, whereas, during prior visits, Dr. Huish noted only a "moderately-to-markedly restricted" ability to perform these motions.

Dr. Huish recommended that the Plaintiff's physical therapy be resumed, and noted that the Plaintiff would remain out of work as he was "totally disabled" for Workers' Compensation purposes.

On May 7, 2013, Dr. Huish noted that the Plaintiff's physical therapy had been successfully reinstated and that, as a result, the swelling in his right shoulder had decreased and his range of motion had improved.

However the Plaintiff continued experiencing pain in his left shoulder, and Dr. Huish noted a slight decrease in his range of motion. The Plaintiff remained out of work and "totally disabled" for Workers' Compensation purposes.

On June 12, 2013, the Plaintiff reported to Dr. Jobin that he felt "pretty good," and the doctor noted that the arthritic pain in his right shoulder was "gone," except for some soreness when he used his right arm for extended periods of time. According to the report from this visit, the Plaintiff had "no restrictions in terms of his activity."

Upon physical examination, the surgical site appeared well-healed, with no warmth or redness and no mechanical symptoms. Despite some stiffness, the Plaintiff had forward elevation of 145 degrees, and external rotation of 50 degrees, with intact external rotation strength. Dr. Jobin noted some "knee swelling," although he did not specify which knee was affected, nor did he elaborate on this symptom or recommend any related treatment.

X-rays of the right shoulder once again showed that the joint was well-positioned without any complications.

On June 19, 2013, Dr. Huish noted that the Plaintiff's right shoulder continued to improve as a result of physical therapy. In this regard, the Plaintiff reported some persistent stiffness and pain, although it "seem[ed] to be getting better." Dr. Huish noted that the Plaintiff had restricted range of motion, strength, and function on the right side. However, he displayed considerably increased mobility on all planes, namely, forward flexion to 115 degrees (previously 85 degrees); abduction to 110 degrees (previously 80 degrees); cross-body adduction to 20 degrees (previously 15 degrees); internal rotation to 40 degrees (previously 30 degrees); and external rotation to 45 degrees (previously 40 degrees).

Dr. Huish also noted that the pain in the Plaintiff's left shoulder persisted; that his range of motion in that joint remained restricted; and he had continued weakness in the supraspinatus.

Dr. Huish continued the Plaintiff's course of physical therapy treatment and declared him "disabled/impaired" for Workers' Compensation purposes.

An MRI of the Plaintiff's left knee performed on August 26, 2013 revealed possible thickness cartilage loss with a subjacent osteochondral lesion; intrameniscal mucoid degeneration of the posterior horn of the medial meniscus without articular extension; a possible closed flap tear; intrasubstance edema and a tear of the popliteus muscle with an adjacent multilobular ganglion cyst; and small joint effusion.

On September 17, 2013, Dr. Huish noted that the Plaintiff had received a transcutaneous electrical nerve stimulation ("TENS") unit, *i.e.*, a noninvasive method of pain management, and had been using it at home "with significant relief." The range of motion in the Plaintiff's right shoulder continued to improve, with forward flexion reaching 130 degrees (previously 115 degrees); abduction reaching 120 degrees (previously 110 degrees); cross-body adduction to 25 degrees (previously 20 degrees); internal rotation to 40 degrees (unchanged); and external rotation to 50 degrees (previously 45 degrees). There was continued weakness in the rotator cuff, although with "ongoing improvement."

Again, Dr. Huish noted the problem in the Plaintiff's left shoulder, which continued to restrict his range of motion. On this date, the Plaintiff was able to perform forward flexion to 115 (previously 130 degrees) and abduction to 110 degrees (previously 120 degrees). His ability to perform cross-body adduction and internal and external rotations was unchanged. Dr. Huish noted "considerable weakness" in the left rotator cuff.

Despite making "objective, measurable improvement" through a physical therapy regimen, the Plaintiff remained out of work and "disabled from any occupation" for Workers' Compensation purposes.

On December 9, 2013, the Plaintiff's right shoulder again showed improved range of motion, and he was able to perform forward flexion to 140 degrees (previously 130 degrees); abduction to 125 degrees (previously 120 degrees); and cross-body adduction to 30 degrees (previously 25 degrees). On this date, Dr. Huish noted that the Plaintiff's ability to perform internal and external rotations was grossly unchanged since the last visit, and that the Plaintiff had improved strength in his right supraspinatus.

The condition of his left shoulder was also unchanged, and Dr. Huish characterized his range of motion in that joint as "markedly restricted." Dr. Huish noted that the Plaintiff remained out of work and disabled for Workers' Compensation purposes.

On April 4, 2014, the Plaintiff reported to Dr. Jobin a constant ache in the anterior aspect of his right shoulder with overhead activity. His progress in physical therapy had slowed. Also, the Plaintiff reported problems with his left shoulder, namely, a deep aching pain and associated loss of strength and function. Nevertheless, the Plaintiff denied any feelings of joint instability. In fact, Dr. Jobin noted that he had regained almost all of his strength.

X-rays of the right shoulder revealed evidence of lesser tuberosity nonunion, which Dr. Jobin believed to be symptomatic. X-rays of the left shoulder showed some glenoid socket polyethylene wear.

On May 22, 2014, Dr. Jobin performed a second surgery on the Plaintiff's right shoulder, this time an open repair and fixation of lesser tuberosity.

## C.    The ALJ's December 17, 2013 Decision

In this appeal, the Plaintiff challenges the ALJ's findings contained in a December 17, 2013 written decision.

The ALJ found that, during the period of time from September 21, 2011 through the date of his decision (previously defined as the "Relevant Time Period") the Plaintiff suffered from a severe impairment – namely, internal derangement of the right shoulder status post arthroplasty, and residuals of left shoulder arthroplasty – which caused more than minimal limitations on his ability to perform basic work activities.

In this regard, the ALJ noted that the Plaintiff had also alleged disability due to hypertension and internal derangement of his left knee. However, the ALJ concluded that the record did not support finding that either of these alleged conditions were severe impairments under the Act. In particular, the ALJ found that the record established that the Plaintiff's hypertension was well-controlled and there was no evidence of any symptomology or functional limitations related to his high blood pressure. Also, the ALJ found that there was no evidence of left knee impairment other than a single episode of swelling in June 2013, namely, nine months after the alleged disability onset

date. In this regard, the ALJ noted that the record contained no evidence that the Plaintiff sought or received any regular course of treatment for any problem with his knees, or that his alleged knee impairment limited his ability to perform any work-related activities.

Notwithstanding the severe impairment caused by the Plaintiff's shoulder injuries, the ALJ determined that he retained the residual functional capacity ("RFC") to perform "light work," as that term is defined in 20 C.F.R. § 404.1567(b), except that he cannot perform grading or pushing and cannot use his right arm for repetitive activities.

In reaching this conclusion, the ALJ noted that the Plaintiff's upper body impairments could reasonably be expected to produce his alleged symptoms, namely, a poor range of shoulder motion; difficulty lifting his arms above his head; difficulty putting on a shirt and applying deodorant; and pain at night. However, the ALJ found that the medical evidence in the record, which he thoroughly summarized, did not entirely support the Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms.

As for the Plaintiff's treating physicians, the ALJ gave little weight to the medical opinion furnished by Dr. Huish that the Plaintiff was "totally disabled." The ALJ characterized this opinion as "vague," and noted that, to the extent that Dr. Huish declared the Plaintiff disabled for Workers' Compensation purposes, that conclusion was entitled to no special significance, as it purports to answer a question reserved for the Commissioner and applies an incorrect legal standard.

The ALJ assigned "great weight, but not controlling weight" to the opinion furnished by Dr. Jobin, as it was largely supported by the objective medical evidence. However, the ALJ noted that, contrary to Dr. Jobin's assessment that the Plaintiff had no restrictions in terms of his activity, there was, in actuality, evidence that the Plaintiff is somewhat limited in his ability to use his upper extremities.

With respect to the consulting physicians, the ALJ assigned "some weight" to the opinion furnished by Dr. Sotudeh that the Plaintiff was capable of "work activity consisting of sedentary

duties with no repetitive use of his right arm and no grabbing or heavy lifting over 20 pounds." In this regard, the ALJ noted that it was somewhat unclear what Dr. Sotudeh meant by the phrase "sedentary duties." Also, while there was evidence to support some restrictions on the Plaintiff's use of his upper extremities, the ALJ noted that there was no evidence of significant limitations on the Plaintiff's abilities to sit, stand, or walk, which would support a "sedentary work" RFC.

Finally, the ALJ also assigned "some weight" to the opinion furnished by Dr. Waller that the Plaintiff was capable of "working sedentary duties only with no repetitive use of his right arm, and no grabbing or pushing." In this regard, the ALJ again noted that Dr. Waller's use of the phrase "sedentary duties" was not clear, and there was no evidence to support significant restrictions on the Plaintiff's abilities to sit, stand, or walk.

Thus, although the ALJ found that the Plaintiff was incapable of performing his past work as a bus driver and a bus inspector – both of which require the exertional capacity to perform medium work – given his age; his high school education; his ability to communicate in English; his prior work experience; and his capacity to perform light work, the ALJ determined that there were nevertheless jobs that existed in significant numbers in the national economy that the Plaintiff could have performed.

In reaching this conclusion, the ALJ acknowledged that, due to the combined effect of the Plaintiff's limitations, he was unable to perform all or substantially all of the requirements of light work. Therefore, "[t]o determine the extent to which these limitations erode the unskilled light occupational base," the ALJ relied upon the October 31, 2013 Vocational Interrogatory completed by Dr. Vandergoot, which, as noted above, concluded that the Plaintiff could perform such representative occupations as surveillance system monitor; school bus monitor; and host/hostess, all of which exist in significant numbers in the national economy.

Therefore, the ALJ determined that the Plaintiff was not disabled under the Act during the Relevant Time Period.

**D.     The Present Appeal**

In this appeal, the Plaintiff sets forth five arguments in support of overturning the ALJ's conclusion that he was not disabled during the Relevant Time Period.

First, the Plaintiff contends that the ALJ failed to develop the record because, at the October 22, 2013 administrative hearing, the ALJ did not ask any questions regarding the nature and severity of the injuries to his left shoulder and left knee.

Second, the Plaintiff contends that the ALJ failed to properly weigh the medical evidence pertaining to Dr. Huish.  In particular, the Plaintiff argues that Dr. Huish was his treating physician within the meaning of the Commissioner's regulations, and therefore, the ALJ erred in failing to give controlling weight to his repeated assertion that the Plaintiff was "disabled" for Workers' Compensation purposes.

Third, the Plaintiff contends that, to the extent Dr. Huish's opinion that the Plaintiff was "disabled" conflicted with other medical opinions in the record, the ALJ should have solicited an independent medical opinion to clarify the Plaintiff's functional limitations.  According to the Plaintiff, the ALJ's failure to do so constitutes legal error.

Similarly, fourth, the Plaintiff contends that the ALJ erred in failing to direct the Plaintiff to undergo a consultative orthopedic evaluation.  In this regard, the Plaintiff asserts that an evaluation by a consulting physician would have assisted in clarifying the nature and severity of his impairments.

Finally, the Plaintiff's fifth ground for relief is essentially a reiteration of his first argument, namely, that the Plaintiff was denied a full and fair administrative hearing because the ALJ failed to ask specific questions about the alleged impairment to the Plaintiff's left shoulder and left knee.

The Commissioner contends that these arguments lack merit; that the ALJ applied the proper legal standards; and that substantial evidence in the record supports her denial of benefits in all respects.

## II.   Discussion

### A.   The Standard of Review

"Judicial review of the denial of disability benefits is narrow" and "[t]he Court will set aside the Commissioner's conclusions only if they are not supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Koffsky v. Apfel*, 26 F. Supp. 475, 478 (E.D.N.Y. Nov. 16, 1998) (Spatt, J.) (citing *Bubnis v. Apfel*, 150 F.3d 177, 181 (2d Cir. 1998)).

Thus, "the reviewing court does not decide the case *de novo*." *Pereira v. Astrue*, 279 F.R.D. 201, 205 (E.D.N.Y. 2010).   Rather, "the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive," *id.*, and therefore, the relevant question is not "whether there is substantial evidence to support the [claimant's view]"; instead, the Court "must decide whether substantial evidence supports *the ALJ's decision*." *Bonet v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (emphasis in original).   In this way, the "substantial evidence" standard is "very deferential" to the Commissioner, and allows courts to reject the ALJ's findings " 'only if a reasonable factfinder would *have to conclude otherwise.*' " *Brault v. SSA*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994) (emphasis in original)).   This deferential standard applies not only to factual determinations, but also to inferences and conclusions drawn from such facts." *Pena v. Barnhart*, No. 01-cv-502, 2002 U.S. Dist. LEXIS 21427, at *20 (S.D.N.Y. Oct. 29, 2002) (citing *Levine v. Gardner*, 360 F.2d 727, 730 (2d Cir. 1966)).

In this context, " '[s]ubstantial evidence' means 'more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)). An ALJ's findings may properly rest on substantial evidence even where he or she fails to "recite every piece of evidence that contributed to the decision, so long as the record 'permits [the Court] to glean the rationale of [his or her] decision.' " *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013)

(quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). This remains true "even if contrary evidence exists." *Mackey v. Barnhart*, 306 F. Supp. 337, 340 (E.D.N.Y. 2004) (citing *DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998), for the proposition that an ALJ's decision may be affirmed where there is substantial evidence for both sides).

The Court is prohibited from substituting its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review. *See Koffsky*, 26 F. Supp. at 478 (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)).

**B.** **As to the Legal Sufficiency of the Plaintiff's Administrative Hearing (The First and Fifth Grounds for Relief)**

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, [the Court] 'must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act.' " *Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 12 (2d Cir. 1990)). "In considering whether the plaintiff received a full and fair hearing, a court should consider such factors as whether the ALJ asked questions regarding the disposition and extent of the claimant's subjective symptoms, the number of witnesses, and the length of the transcript." *Almonte v. Apfel*, No. 96-cv-1119, 1998 U.S. Dist. LEXIS 4069, at *21-*23 (S.D.N.Y. Mar. 31, 1998).

In this regard, it is well-settled that an ALJ has an affirmative duty to develop the administrative record, *see Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000), which "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on [his or her] functional capacity," *Brown v. Comm'r of Soc. Sec.*, 709 F. Supp. 2d 248, 255-56 (S.D.N.Y. 2010).

For example, in *Sarjeant v. Chater*, No. 97-6282, 1998 U.S. App. LEXIS 28011 (2d Cir. Oct. 29, 1998), the plaintiff appealed from a district court decision upholding the Commissioner's denial of

benefits. She argued that she had not received a full and fair administrative hearing because the ALJ failed to question her sufficiently regarding her subjective complaints of pain. The Second Circuit disagreed, relying on the following brief colloquy on the record:

> Q: Where do you experience pain?
> A: Well, my neck, I would say pretty well my entire back, my tailbone, sometimes my knees, sometimes my feet.
> Q: Do you have this pain all the time or does it come and go?
> A: It just come and go [*sic*]. Then, like I say, I have to take medication for it. And I'm also seeing a doctor in between that's treating me for my pain.

*Id* at *6.

Further, in that case, the ALJ had explicitly asked the plaintiff whether there was anything else that she felt was important for him to know in connection with her application for benefits. Under those circumstances, the court concluded that the ALJ had provided the plaintiff with a sufficient opportunity to testify about her subjective complaints of pain.

Similarly, in *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29 (2d Cir. 2013), the Second Circuit affirmed summary judgment for the Commissioner in a case where the plaintiff argued that she was denied a full and fair hearing because the Turkish interpreter provided by the SSA was ineffective. The court rejected this argument, reasoning that the plaintiff failed to establish how any alleged interpretation issue had disadvantaged her. In this regard, the court found it to be important that the plaintiff's counsel was present at the hearing and was given an opportunity at the close of the proceedings to ask further questions, and thus ensure that the entirety of his client's position was on the record.

Several district court decisions are in accord. *See, e.g.*, *Gardner v. Colvin*, No. 13-cv-787, 2014 U.S. Dist. LEXIS 146177, at *12-*13 (W.D.N.Y. Oct. 14, 2014) (rejecting the plaintiff's claim that she was denied a full and fair hearing where she testified as to her shoulder injury and subsequent surgery; her functional limitations, including difficulty lifting her hands over her head; and the ALJ gave counsel an opportunity to question the vocational expert witness about the extent of the

plaintiff's functional limitations and the effect of those limitations on her ability to work); *Maurice v. Colvin*, No. 12-cv-2114, 2014 U.S. Dist. LEXIS 91263, at *43-*44 (S.D.N.Y. July 2, 2014) (Report and Recommendation) (finding that where the plaintiff was represented by counsel, and had a full opportunity to confront the medical evidence by presenting witness testimony, introducing medical documentation of her own, and cross-examining the vocational expert, but failed to exercise these rights, she was estopped from complaining that she was denied a full and fair hearing); *Pokluda v. Colvin*, No. 13-cv-335, 2014 U.S. Dist. LEXIS 59337, at *10-*11 (N.D.N.Y. Mar. 21, 2014) (Report and Recommendation), *adopted*, 2014 U.S. Dist. LEXIS 58394 (N.D.N.Y. Apr. 28, 2014) (determining that the plaintiff's hearing had been " 'full and fair' in every sense as that term is commonly understood" where: she received notifications prior to the hearing explaining the process and her rights; she attended the hearing, testified, and was able to hear and question all witnesses; she was allowed to present evidence; the ALJ assembled and considered all of her medical records and credited opinions expressed by her attending physicians; medical and psychiatric evaluations were completed; and opinions were obtained from medical and vocational experts); *Mikol v. Barnhart*, 494 F. Supp. 2d 211, 223 (S.D.N.Y. 2007) (holding that the plaintiff had "clearly" received a full and fair hearing where he was represented by counsel who was present at the hearing; the ALJ was supplied with and reviewed the voluminous medical records prior to the hearing and questioned plaintiff regarding his injuries; and counsel was permitted to ask questions of plaintiff and the vocational expert).

Applying these standards, the Court finds that the Plaintiff in this case was afforded a full and fair administrative hearing in connection with his application for benefits.

Initially, the Court notes that the Plaintiff does not challenge any procedural aspects of the hearing – that is, he does not dispute that he received adequate notice and time to prepare for the hearing; that he appeared at the hearing and was ably represented by counsel of his own choosing; that both he and the ALJ were provided with and reviewed all relevant medical evidence in advance

of the proceeding; that the Plaintiff was permitted to confront such evidence, by testifying on his own behalf and calling witnesses to testify; and that his counsel was given an opportunity to question any witnesses called by the ALJ.

Rather, the gravamen of the Plaintiff's current contention is that the ALJ did not sufficiently delve into the substantive issue of the nature and severity of certain of his impairments, as evidenced by the fact that, apparently, the hearing was quite brief, generating only seven pages of testimony. In this regard, the Plaintiff argues that, despite the underlying record being "replete with information regarding [his] left shoulder condition," the ALJ failed to ask any specific questions about it. Nor did the ALJ ask any questions specifically concerning the Plaintiff's alleged knee condition.

However, in the Court's view, contrary to the Plaintiff's conclusions, the transcript is clear that the ALJ repeatedly referred to the pertinent medical evidence in the record; explicitly questioned the Plaintiff about the alleged impairments to both shoulders, his knee, and the attendant functional limitations; and that the Plaintiff and his counsel were given ample opportunity to ensure that the entirety of the Plaintiff's position was on the record:

> Q:      So, sir, what is the major problem you're having here, is it your shoulders, is it your right arm, what's your number one health issue?
> A:      Both of my shoulders. I had two total shoulder replacements.
>
> *       *       *
>
> Q:      Who has been treating you?
> A:      I had my first shoulder replacement done by Dr. Louis Bigliani back in 2000. I just had my—
> Q:      What exhibit is that, Counsel?
> ATTY:   That's not in there, Your Honor. That's from the year 2000 which predates the date of disability.
>
> BY ADMINISTRATIVE LAW JUDGE:
>
> Q:      Okay. And what's your second—
> A:      I had my second shoulder replacement in December of this year, December 27th.
> Q:      Of 2012?
> A:      Yes.
> Q:      And who did that?
> A:      Dr. Jobin, Charles Jobin.
> ALJ:    Okay, Exhibit 9F, Counsel?
> ATTY:   Yes, Your Honor, and the surgical chart is 4F, 5F and 6F, Your Honor.

*       *       *

Q:       Okay.  What is the biggest problem you have that prevents you from
         working?
A:       Just range of motion.  I don't have no – the range of motion is, is bad.
Q:       What do you mean by that?
A:       Just putting my hands straight over my head, anything.  The arthritis pain is
         gone but I have no range of motion.
ALJ:     So your upper body, your upper extremities. . . . Counsel, . . . what
         arguments are you making, . . . what's the essence of this case?
ATTY:    Well, Your Honor, . . . [h]e has a serious right shoulder condition with a
         torn rotator cuff tear, tendinosis, arthritis, derangement 50 percent loss of
         use.  He's overweight.  He's had a weight gain of at least over 10 pounds
         since he stopped—

                              *       *       *

ALJ:     And he had both shoulders replaced?
ATTY:    Yes, Your Honor, one in 2000.  They're telling him that he needs another left
         shoulder replacement.  His right – he's right-hand dominant and he had that
         surgery December 22 [*sic*] of 2012 and he has also developed a  right knee
         condition and had his knee drained in September, and I have you the MRI
         report.
CLMT:    It's the left knee.
ATTY:    I'm sorry, left knee.  And I gave you the MRI report of August 26, 2003 [*sic*],
         it shows cartilage loss, degeneration of the posterior medial meniscus, a flap
         tear, [edema], and he also has [ef]fusion.  . . . I believe that's [Exhibit] 11F.
         We believe he has been unable to work since September 21, 2012. . . .

                              *       *       *

ALJ:     . . . What kind of pain do you have, sir?
CLMT:    I have, I have pain when I try to reach for something, I'll get, you know, on a
         range of one to ten, I'll get six, seven.  It's just—
ALJ:     When else do you have the pain?
CLMT:    When I, I sleep.  If I lay on my shoulders.  I try to sleep on my back, that
         doesn't work.  I'm a side sleeper.  I wake up with pain when I sleep.
         Putting—just putting on a shirt I, I have problems.  Shirts, jackets, putting
         on deodorant I have problems.  It's just—

R. 79-84.

      As can be seen from the transcript, the Plaintiff specifically testified that he suffers from

impairments to "both shoulders" following "two total shoulder replacements" and that additional

surgery may be required to repair his left shoulder.

      In addition, as the Commissioner points out, the Plaintiff concedes, for purposes of this

appeal, that the underlying administrative record is "replete" with medical data concerning the

nature and severity of his left shoulder injury – data which the Plaintiff does not dispute the ALJ properly reviewed and considered in rendering his decision.

Similarly, the record is clear that, despite repeatedly being asked to describe his symptoms and functional limitations, the Plaintiff failed at any point to identify a problem with his knee. Nonetheless, his attorney identified the alleged knee injury for the ALJ, and specifically directed him to the diagnostic and laboratory evidence in the record relating to this condition. The Court notes that, again, the Plaintiff does not assert as a basis for relief in this appeal that the ALJ misevaluated this medical evidence.

In sum, in the Court's view, the record is clear that the ALJ repeatedly asked the Plaintiff and his counsel open-ended questions regarding the Plaintiff's alleged disability, during which they had a full and fair opportunity to expound upon the extent of the left shoulder and knee impairments. However, the record reveals that they apparently consistently failed to do so, focusing predominantly on the Plaintiff's right shoulder impairment and other conditions such as his obesity, what are not at issue in this case. Accordingly, the Plaintiff cannot now be heard to complain that ALJ breached his duty to develop a record by failing to more directly or persistently question the Plaintiff for such information.

Further, and of importance, after expert witness Frank Lindner testified unequivocally that there were jobs that existed in significant numbers in the national economy that someone within the Plaintiff's limitations could perform, the Plaintiff's counsel was given, but waived, an opportunity to cross-examine that witness.

Finally, at the close of the proceedings, the ALJ gave both the Plaintiff and his attorney opportunities to add and/or clarify any information relevant to the Plaintiff's application for disability benefits. Both declined to do so, opting instead to rest on the Plaintiff's written brief:

|        |                                                                                          |
|--------|------------------------------------------------------------------------------------------|
| ALJ:   | Counsel, what questions do you have or what else did you want to tell me, if anything?    |
| ATTY:  | Your Honor, I have no questions of the vocational witness.                                |
| ALJ:   | Anything else you want to say for the hearings?                                           |
| ATTY:  | I think the brief, 12E stands for itself, I think the testimony of my client is very credible and supportive that he is unable to work. |
| ALJ:   | Okay. All right, thank you.                                                               |

*       *       *

REEXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

| Q: | Sir, do you have anything else you want to tell me? |
|----|-----------------------------------------------------|
| A; | No, no, Your Honor.                                 |

R. 84-85.

Under these circumstances, the Court discerns no rational basis for concluding that the Plaintiff was denied a full and fair administrative hearing or that the ALJ failed in his duty to develop a record.

The Plaintiff relies on *Hankerson v. Harris*, 636 F.2d 893 (2d Cir. 1980), and *Cruz v. Sullivan*, 912 F.2d 8 (2d Cir. 1990), as standing for the general proposition that an ALJ breaches his duty to develop the record where the transcript of an administrative proceeding is short. However, these cases are factually distinguishable, as both involved *pro se* plaintiffs, to whom ALJs owe an especially heightened duty to develop a record. *See, e.g., Surita ex rel. Cifuentes v. Astrue*, No. 07-cv-8461, 2008 U.S. Dist. LEXIS 97868, at *21-*22 (S.D.N.Y. Nov. 21, 208) (Report and Recommendation), *adopted*, 2008 U.S. Dist. LEXIS 103328 (S.D.N.Y. Dec. 18, 2008).

Accordingly, to the extent the Plaintiff seeks to overturn the ALJ's decision based on an alleged violation of the ALJ's duty to affirmatively develop the record and/or an alleged denial of a full and fair administrative hearing, his cross-motion for judgment on the pleadings is denied.

**C.**     <u>**As to the ALJ's Evaluation of the Opinion Furnished by Dr. Huish**</u>
               **(The Second Ground for Relief)**

"The method by which the Social Security Administration is supposed to weigh medical opinions is set forth at 20 C.F.R. § 404.1527[c]." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Relevant here, "[t]he regulations say that a treating physician's report is generally given more weight than other reports and that a treating physician's opinion will be controlling if it is 'well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record.'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)).

This rule – the "Treating Physician Rule" – reflects the generally-accepted view that "'the continuity of treatment [a treating physician] provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.'" *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting *Mongeur*, 722 F.2d at 1039 n.2); *see Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (noting that the regulations recognize that treating physicians "are likely to be the medical professionals most likely to provide a detailed, longitudinal picture of . . . medical impairment" (quoting 20 C.F.R. § 416.927(d)(2))).

Generally, where the ALJ declines to give controlling weight to a treating physician's opinion, he must provide the claimant with "good reasons" for doing so, and must consider various factors to determine how much weight to give the opinion. *See Blanda v. Astrue*, No. 05-cv-5723, 2008 U.S. Dist. LEXIS 45319, at *18 (E.D.N.Y. June 9, 2008); 20 C.F.R. § 404.1527(c)(2). In particular, "to override the opinion of the treating physician, [the Second Circuit] ha[s] held that the ALJ must explicitly consider, *inter alia*, (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129).

In this case, the Plaintiff asserts that the Treating Physician Rule required controlling weight to be assigned to Dr. Huish's assessment that he was "disabled" or "totally disabled" for Workers' Compensation purposes, or in the alternative, to supply good reasons for not doing so. The Court disagrees.

On this issue, the Court's recent analysis in *DiCarlo v. Colvin*, No. 15-cv-0258, 2016 U.S. Dist. LEXIS 122312, at \*38-\*43 (E.D.N.Y. Sept. 9, 2016), is relevant.

As in that case, here, despite the fact that Dr. Huish is apparently a treating physician within the meaning of the Commissioner's regulations, it is well-settled that "(1) a medical source's conclusion that an individual is disabled is not entitled to controlling weight; [and] (2) a conclusion as to disability status made in the Workers' Compensation context is not binding." *Bynum v. Astrue*, No. 11-cv-5111, 2013 U.S. Dist. LEXIS 63792, at \*7 (E.D.N.Y. May 3, 2013).

As to the first of these principles, one district court in this District (Block, J.) has appropriately observed that:

> [T]he treating physician rule does not require deference to [treating physicians'] conclusions that [a claimant] is disabled because the "ultimate finding of whether a claimant is disabled and cannot work" is an issue reserved to the Commissioner. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). "[S]tatement[s] by a medical source that you are 'disabled' or 'unable to work' " are not "medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner" 20 C.F.R. §§ 404.1527(d)-(d)(1), 416.927(d)-(d)(1). As such, the regulations make clear that the Commissioner need "not give any special significance to the source" of those opinions. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *see Snell*, 177 F.3d at 133. Thus, [treating physicians'] assessments of [a claimant's] "disability status" are not entitled to controlling weight since the treating physician rule does not govern issues reserved to the Commissioner. *See Earl-Buck v. Barnhart*, 414 F. Supp. 288, 293 (W.D.N.Y. 2006) ("A treating source's statement that plaintiff 'is totally disabled,' . . . is not considered a 'medical opinion' under the treating physician's rule to which controlling weight should be assigned because it represents an opinion on an issue reserved to the Commissioner.")

*Bynum*, 2013 U.S. Dist. LEXIS 63792, at \*7-\*8.

Thus, in this case, contrary to the Plaintiff's contention, Dr. Huish's statements that the Plaintiff was "disabled" for Workers' Compensation purposes are not medical opinions that would come within the purview of the Treating Physician Rule. They are, instead, conclusory statements regarding the ultimate issue in the case. *See Bartko v. Colvin*, No. 13-cv-373, 2014 U.S. Dist. LEXIS 139117, at \*17-\*18 (N.D.N.Y. Sept. 5, 2014) (Report and Recommendation), *adopted*, 2014 U.S. Dist. LEXIS 138038 (N.D.N.Y. Sept. 30, 2014) (rejecting the plaintiff's argument that the ALJ erred in failing to apply the Treating Physician Rule to a doctor's opinion that he was totally disabled; noting

he had "cite[d] no authority, . . . and independent research fail[ed] to disclose, any statute, regulation, ruling or judicial precedent stating that an *ultimate-issue* opinion from a treating medical source is entitled to presumptive controlling weight under the treating physician rule, or that when controlling weight is not afforded, that opinion must then be weighed according to the six regulatory factors listed [in 20 C.F.R. § 404.1527(c)(2)], and also accompanied by a statement of good reasons justifying the weight given. And, as ultimate-issue opinion is *never* presumptively afforded controlling weight, it is doubtful that such authority exists. Application of the six regulatory factors to an ultimate-issue opinion would be awkward at best" (emphasis in original)).

As to the second principle listed above, this and other courts have consistently recognized that "[t]he disability standards under the Social Security Act and New York Workers' Compensation Law are markedly distinct; 'therefore, an opinion of disability rendered for purposes of workers' compensation is not binding under the Social Security Act.'" *Fernandez v. Apfel*, No. 98-cv-6194, 2000 U.S. Dist. LEXIS 2856, at *20 n.8 (quoting *Shiver v. Apfel*, 21 F. Supp. 2d 192, 197 (E.D.N.Y. 1998)); *see Provisero v. Colvin*, No. 14-cv-1830, 2016 U.S. Dist. LEXIS 104503, at *37 (E.D.N.Y. Aug. 8, 2016) (Spatt, J.) (noting that a treating physician's assessment of a partial disability for Workers' Compensation purposes was "not determinative" in a civil appeal because "the standard for what constitutes a 'disability' under the Social Security Act is more stringent" (citation omitted)); *Davies v. Astrue*, No. 08-cv-1115, 2010 U.S. Dist. LEXIS 70401, at *14 (N.D.N.Y June 17, 2010) (Report and Recommendation), *adopted*, 2010 U.S. Dist. LEXIS 70418 (N.D.N.Y. July 14, 2010) ("Contrary to Plaintiff's argument, the ALJ properly discounted [a treating physician's] opinions that Plaintiff was unable to work because they were rendered for a Worker's Compensation claim").

For these reasons, the Court finds that the ALJ correctly declined to give any special significance to Dr. Huish's pronouncements that the Plaintiff was disabled for Workers' Compensation purposes. The Court also finds that, because Dr. Huish's statements in this regard

were ultimate-issue opinions pertaining solely to an outside agency's disability determination, the ALJ was under no additional obligation to weigh the statements according to the Commissioner's regulatory factors and set forth good reasons for not doing so.

On the contrary, consistent with his duties under the regulations, the ALJ explicitly considered Dr. Huish's statements for the fact that they were made; thoroughly discussed the balance of objective medical evidence contained in Dr. Huish's records and the results of related diagnostic studies of the affected joints; and, in the Court's view, arrived at a reasoned and well-supported RFC determination. *See* Social Security Ruling ("SSR") 06-03p, *available at* 2006 SSR LEXIS 5, at *17 (Jan. 1, 2006) ("[W]e are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies and . . . [t]herefore, evidence of a disability decision by another government or nongovernmental agency cannot be ignored and must be considered"); *see also Davies*, 2010 U.S. Dist. LEXIS 70401, at *14-*15 (although a treating physician's disability assessment, rendered for Workers' Compensation purposes, was not binding or entitled to controlling weight, the ALJ was obligated not to ignore it, and fulfilled his responsibilities by specifically discussing the medical evidence underlying the opinion). Accordingly, applying these principles, the Court finds no error in the ALJ's approach.

Therefore, to the extent the Plaintiff seeks to overturn the ALJ's decision based on an alleged violation of the Treating Physician Rule and/or a misevaluation of the evidence relating to Dr. Huish, his cross-motion for judgment on the pleadings is denied.

D.      **As to the Need for an Expert Medical Opinion**
        **(The Third Ground for Relief)**

As noted above, the Plaintiff contends that, to the extent that Dr. Huish's opinion that he was "disabled" for Workers' Compensation purposes conflicted with other medical opinions in the

record, the ALJ should have solicited an independent medical opinion to clarify the extent of his functional limitations. In the Court's view, this argument is without merit.

As an initial matter, the sole authority relied upon by the Plaintiff is a publication entitled THE SOCIAL SECURITY ADMINISTRATION HEARINGS, APPEAL AND LITIGATION MANUAL, also known as "HALLEX," which provides, in part, that an ALJ may need to obtain expert testimony "when the medical evidence is conflicting or confusing." *See* HALLEX I-2-5-34(A) (Sept. 28, 2005).

However, as the Commissioner rightly notes, "courts in the Eastern District of New York have held that 'a failure to follow procedures outlined in HALLEX does not constitute legal error.' " *Valet v. Astrue*, No. 10-cv-3282, 2012 U.S. Dist. LEXIS 7315, at *34-*35 n.21 (E.D.N.Y. Jan. 23, 2012) (collecting cases); *see also Harper v. Comm'r of Soc. Sec.*, No. 08-cv-3803, 2010 U.S. Dist. LEXIS 137500, at *10-*11 (E.D.N.Y. Dec. 30, 2010) (cautioning against "frivolous appeals to the HALLEX" because that publication "is simply a set of internal guidelines for the SSA, not regulations promulgated by the Commissioner" and therefore, "[a] failure to follow proceudres outlined in HALLEX . . . does not constitute legal error").

Therefore, to the extent the Plaintiff contends that the ALJ violated a duty imposed by the HALLEX, his argument is misplaced.

In any event, as a general matter, " '[w]hether additional medical evidence is necessary to adequately develop the record beyond that statutorily mandated by the Act is under the discretion of the ALJ.' " *Brown*, 709 F. Supp. 2d at 257 (quoting *Infante v. Apfel*, No. 97-cv-7689, 2001 U.S. Dist. LEXIS 6578, at *21 (S.D.N.Y. May 21, 2001)). Based on its own careful review of the entire record, the Court finds that the ALJ did not abuse his discretion by failing to consult a medical expert to "clarify and explain" the competing medical opinions.

First, for the reasons already stated, it can hardly be said that Dr. Huish's conclusory statement that the Plaintiff was "disabled" for Workers' Compensation purposes created a genuine

conflict or even a material issue of fact regarding the medical evidence, which might require clarification, explanation, or resolution of the kind urged by the Plaintiff.

Second, it is well-settled that an ALJ has no duty to further develop the record where there are no obvious gaps and where he already possesses a complete medical history. *See Johnson v. Colvin*, No. 14-cv-353, 2016 U.S. Dist. LEXIS 19180, at *10 (W.D.N.Y. Feb. 17, 2016); *see also Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996), for the proposition that, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim").

In this case, the Court discerns no obvious gaps in the administrative record, and the Plaintiff has not identified any. Nor does the Plaintiff contend that, without the opinion of an independent medical examiner, the ALJ lacked a complete medical history. On the contrary, as outlined above, the administrative record in this case, which spans more than 500 pages, includes a five-and-a-half-year treatment portfolio detailing the Plaintiff's care under three treating physicians and two consulting orthopedists, as well as voluminous physical therapy progress notes and the results of multiple diagnostic tests. Thus, in the Court's view, the ALJ already possessed a complete medical history, and the evidence in the record was more than sufficient to permit the ALJ to accurately assess the Plaintiff's RFC.

Under these circumstances, the Court discerns no rational basis for the ALJ to have sought an additional medical opinion and identifies no legal error in his decision not to do so. To the extent the Plaintiff seeks to overturn the ALJ's decision based on a failure to develop the record by not obtaining additional medical evidence, his cross-motion for judgment on the pleadings is denied.

E.  **As to the Need for an Additional Consultative Evaluation**
    **(The Fourth Ground for Relief)**

For substantially the same reasons as outlined above, the Court also disagrees with the Plaintiff's contention that the ALJ erred by failing to arrange for the Plaintiff to undergo an additional consultative orthopedic evaluation before ruling on his application for benefits. Again, the Plaintiff argues that, notwithstanding the wealth of medical evidence in the record, including the opinions of two consulting orthopedists who examined him during the Relevant Time Period, a third consulting orthopedist was needed to clarify the nature and severity of his impairments. In the Court's view, this argument is patently without merit.

Generally, "[a] consultative examination is used to 'try to resolve an inconsistency in the evidence, or when the evidence as whole is insufficient to allow [the ALJ] to make a determination or decision' on the claim." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29 (2d Cir. 2013). However, upon review of the entire record, and for the reasons already discussed, the Court finds that the evidence in this case, which the ALJ discussed at length, was more than sufficient to permit a determination on the Plaintiff's claim.

To the extent the Plaintiff seeks to overturn the ALJ's decision based on a failure to develop the record by not arranging for an additional orthopedic consultation, his cross-motion for judgment on the pleadings is denied.

### III.    CONCLUSION

Based on the foregoing, it is hereby ordered that the Commissioner's motion under FED. R. CIV. P. 12(c) for judgment on the pleadings is GRANTED;

The Plaintiff's cross-motion under FED. R. CIV. P. 12(c) for judgment on the pleadings is DENIED; and

The August 15, 2014 final decision of the Commissioner that the Plaintiff is not entitled to Social Security disability insurance benefits for the Relevant Time Period is AFFIRMED in all respects.

The Clerk of the Court is respectfully directed to close this case.

It is **SO ORDERED:**

Dated:          Central Islip, New York
                September 27, 2016          _/s/ Arthur D. Spatt_ _____
                                            ARTHUR D. SPATT
                                            United States District Judge